**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                  **Plaintiff,**<br><br>    v.<br><br>**AVRAHAM EISENBERG,**<br><br>                                  **Defendant.** | **Civil Action No. 1:23-cv-503**<br><br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC") for its

Complaint against Avraham Eisenberg ("Eisenberg") alleges as follows:

## SUMMARY

1.      Eisenberg drained approximately $116 million from a crypto asset trading

platform known as Mango Markets after manipulating the trading price and volume of the

"MNGO token," a so-called "governance token" of Mango Markets that was purchased and sold

as a crypto asset security.

2.      Beginning on or around October 11, 2022, Eisenberg, using accounts on Mango

Markets he controlled, sold and contemporaneously purchased purported perpetual futures

contracts with respect to approximately 488 million MNGO tokens (out of approximately 500

million tokens in circulation).

3.      Eisenberg then submitted and executed a series of large purchases of the thinly

traded MNGO tokens at incrementally higher prices, to artificially raise its price.

4.      The trading volume on the day of Eisenberg's manipulation was over 2,000%

higher than the average volume for the preceding ten trading days (and 2,018% higher than the

average volume for the preceding 90 trading days), and Eisenberg's transactions artificially increased MNGO's price on Mango Markets by more than 2,200%. These transactions also increased the price of MNGO perpetual futures contracts by approximately 1,300%, significantly increasing the value of Eisenberg's long MNGO perpetual futures position.

5.     The increased value of Eisenberg's long MNGO perpetual futures position allowed him to use that position as collateral to borrow and ultimately withdraw from the Mango Markets platform approximately $116 million worth of various crypto assets – some of which belonged to investors trading on the Mango Markets platform, thereby draining all available assets from the platform.

6.     After withdrawing the $116 million in crypto assets, Eisenberg stopped manipulating the price of the MNGO token, which led to significant declines in the prices of MNGO and MNGO perpetual futures contracts.

7.     From the peak of Eisenberg's manipulation of the MNGO token to the date of this filing, the price dropped by approximately 90% in regular market trading, the volume plummeted by approximately 80%, and the MNGO token became more illiquid, thereby harming investors.

8.     Eisenberg perpetrated the attack on Mango Markets while in Puerto Rico, but soon thereafter fled the country.

9.     On December 26, 2022, Eisenberg returned to Puerto Rico and was arrested on charges of commodities fraud and commodities manipulation in connection with the facts alleged herein.

10.     As set forth more fully below, the MNGO tokens Eisenberg purchased and manipulated were purchased and sold as investment contracts and therefore as "securities" under the federal securities laws.

11.     By engaging in the misconduct described here, Eisenberg violated numerous provisions of the federal securities laws, including certain antifraud and anti-market manipulation provisions, as detailed below.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.     The SEC brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

13.     The SEC seeks a final judgment against Eisenberg: (a) permanently enjoining him from engaging in acts, practices, and courses of business alleged herein; (b) ordering him to disgorge his ill-gotten gains and pay prejudgment interest thereon pursuant to Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)]; (c) imposing civil money penalties on him pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (d) permanently enjoining Eisenberg from (i) participating, directly or indirectly, in the purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction shall not prevent Eisenberg from participating in any employer sponsored retirement plan offered pursuant to his employer, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendant, directly and indirectly, has made use of the means or instruments of transportation or communication in, and the means and instruments of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant conducted certain transactions, acts, practices, and courses of business constituting the violations alleged herein within this district, including transacting MNGO tokens using a crypto asset trading platform with offices in this district.

**DEFENDANT**

16.      **Eisenberg**, age 27, is a U.S. citizen and is currently incarcerated at Metropolitan Detention Center Guaynabo, Puerto Rico, awaiting transport to the Southern District of New York. He is facing criminal charges of commodities fraud, commodities manipulation, and wire fraud in *United States v. Eisenberg*, 1:23-cr-10 (S.D.N.Y.), and civil charges of violations of the Commodity Exchange Act and regulations thereunder in *CFTC v. Eisenberg*, 1:23-cv-173 (S.D.N.Y.).

**OTHER RELEVANT ENTITIES**

17.     **Mango Markets** ("Mango Markets") is a crypto asset trading platform built on a cryptographically secured ledger known as the "Solana blockchain."

18.     **Mango Labs, LLC** ("Mango Labs") is a Wyoming corporation with its principal place of business in San Francisco, California. Mango Labs was involved in the development of Mango Markets.

19.     **Blockworks Foundation** ("Blockworks Foundation" and, together with Mango Labs, "Mango") is a Panamanian entity with an unknown place of business. Blockworks Foundation was involved in the development of Mango Markets.

20.     **Mango DAO** ("Mango DAO") is an unincorporated business entity with an unknown place of business. Mango DAO is the governing body of Mango Markets.

## BACKGROUND ON CRYPTO ASSETS

21.    The term "crypto asset" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "digital assets," "cryptocurrencies," digital "coins," and digital "tokens."

22.    A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

23.    Crypto assets are typically represented in one or more blockchains, meaning that records of their ownership and transfer are stored on that particular digital ledger or blockchain.

24.    Some digital assets may be "native tokens" to a particular blockchain – meaning that they are represented on their own blockchain, though other digital assets may also be represented on that same blockchain. Native tokens typically serve a number of technical functions on a distributed ledger, such as helping secure the ledger from manipulation or other forms of attacks. Like other "digital tokens," native tokens may also be sold and traded for consideration, including on secondary markets.

25.    Examples of crypto asset blockchains include the "Bitcoin blockchain," to which the crypto asset known as Bitcoin is the native asset; the "Ethereum blockchain," to which the crypto asset known as ETH is the native asset; and the "Solana blockchain," to which the crypto asset known as SOL is the native asset.

26.    In addition to trading activities that involve purchases and sales of one crypto asset for another, whether or not such purchases and sales are reflected on a blockchain or effected through a crypto asset trading platform, there are other transactions involving crypto assets that do not involve transfers of the crypto asset from one market participant to another.

Instead, in these types of transactions, one party agrees to pay another party a return based on the performance of another asset. One of these types of transactions is what has become known in the crypto asset trading area as a "perpetual futures contract." While the crypto asset industry refers to these arrangements as a future, in fact these are not futures contracts offered and sold on regulated futures exchanges or in compliance with laws applicable to futures transactions.

27.     When an investor buys or sells a perpetual futures contract for a particular crypto asset, the investor is not buying or selling that crypto asset. Instead, the investor is buying or selling exposure to future movements of that crypto asset's price relative to another asset, including another crypto asset. For example, an investor who buys a perpetual futures contract based on the relative value of certain crypto assets has a synthetic "long" position on the crypto assets, and the value of the investor's position in the contract will rise if the relative value of the crypto assets rises. Conversely, the investor who sold that perpetual futures contract has a synthetic "short" position on the crypto assets, and the value of that position will rise if the relative value of the crypto assets falls. Either party to a perpetual futures contract can settle the contract at any time and realize their gain or loss.

## FACT ALLEGATIONS

28.     Mango Markets is a crypto asset trading platform built on the Solana blockchain. Mango Markets launched in or about March 2021.

29.     Mango Markets operated through websites that were accessible to the general public, including to persons in this district.

30.     As discussed in greater detail below, Mango Markets offered and sold the MNGO token, a so-called "governance token," as an investment contract and, therefore, the MNGO token is a security.

31.     From approximately March 2021 until trading was halted on or about October 12, 2022, investors could buy and sell the MNGO token and other crypto assets on Mango Markets.

**Mango Offers and Sells MNGO Tokens in Unregistered Transactions.**

32.     Between August 9 and 10, 2021, Mango offered and sold 500 million MNGO tokens (5% of the maximum supply), in exchange for consideration in the form of the crypto assets known as USD Coin ("USDC"), to the general public on its website (https://www.token.mango.markets).

33.     To publicly promote the offer and sale of MNGO, Mango published, among other things, a "Litepaper" that generally described the terms of the offering and certain rights that MNGO token holders would be entitled to.

34.     Under the terms of the Mango offer, participants had 24 hours to deposit as much USDC as they wanted to a smart contract on Mango Markets, referred to as a "vault" on the website.

35.     For the next 24 hours, deposits were frozen, but users could decide to withdraw any USDC deposited based on seeing the estimated price for the MNGO token.

36.     Buyers got a pro-rata price for the MNGO token at the end of the two-day token sale and every participant got the same price for MNGO tokens: 0.141 USDC.

37.     U.S. investors were purportedly ineligible to participate in this MNGO token sale. However, at least several investors who received MNGO tokens from the initial distribution, including several of Mango Markets' creators, resided in the United States at the time.

38.     As a result of this offering, MNGO tokens were held by thousands of investors, dispersed across the globe, with a limited ability to communicate with one other.

39.     MNGO was tradeable on both Mango Markets and secondary trading platforms, including in the United States, immediately following the sale.

40.     Beginning on August 11, 2021, the day after the sale concluded, Mango tweeted out the names of the crypto asset trading platforms that offered trading of the MNGO token, and the Mango Markets website contained links to websites where investors could purchase and sell MNGO tokens.

41.     Both prior to and immediately following the offering, participants on Mango's Twitter and Discord feeds discussed whether investors were free to sell their MNGO tokens.

42.     Mango also retweeted a YouTube video on August 9, 2021 (the first day of the sale) and a post in which commenters speculated that purchasers of the token were attempting to keep the price as low as possible so that it would rise when the token was made available for trading on secondary platforms following the sale.

**MNGO Token Holders Entered into a Common Enterprise.**

43.     The price of MNGO tokens moved up and down together. In other words, the price of the MNGO token rose and fell equally for each MNGO token holder such that each investor profited or suffered losses pro rata based on the ownership share of MNGO tokens.

44.     Mango also touted that the proceeds of the MNGO token sales would be pooled and used indiscriminately to pursue MNGO's projects – not divided into subaccounts for sub groups of MNGO token investors.

45.     Mango stated publicly that the funds raised through the sale of 5% of the MNGO token supply (over $70 million) went to the treasury of the Mango DAO, the Mango Markets governing body, for use as a so-called "insurance fund."

46.     According to Mango's "Litepaper," the "insurance fund will pay MNGO Perp[etual future]s smart contracts in the event extreme volatility causes bankrupt accounts and excess losses in the system."

47.     Mango stated publicly that another 5% of the MNGO token supply went to the "creators" of Mango Markets and the remaining 90% was for the Mango DAO treasury and could only be unlocked/distributed via governance proposals.

48.     Approximately ten individuals collectively received the 5% of the MNGO token supply that was allocated at the time of the token sale for the "creators."

**MNGO Token Holders Expect Profits Derived from the Mango Creators' Efforts.**

49.     Investors could also use MNGO tokens to participate in liquidity provider pools on the Mango Markets platform, and token holders could earn more MNGO tokens as a reward for providing liquidity.

50.     In addition, MNGO token holders could continuously earn interest on their tokens.

51.     According to the Litepaper, to "earn interest, simply deposit into your Mango Markets Account; all assets automatically earn interest. Annual rates are displayed in the Account page in green."

52.     The Litepaper contained a "Project Status & Roadmap" section, which detailed the efforts that Mango Markets had taken – and would take – to develop the platform.

53.     The Mango Markets creators also provided significant managerial efforts to develop the platform, both prior to and following the MNGO token sale.

54.     For example, the Mango Markets creators developed and deployed code for the different versions of the platform, created content for the Mango Markets' website, fed the

content of Mango Markets' Twitter account, submitted and voted on governance proposals, and responded to queries from MNGO token holders and others about the platform and the MNGO token on the Mango Markets' Twitter and Discord feeds.

**MNGO Token's "Governance" Rights Are Illusory.**

55.     The "governance" afforded to MNGO token holders was limited and minimal – and was non-existent for those MNGO token holders that did not deposit the requisite amount.

56.     According to Mango's Litepaper, the MNGO token "is a governance token, first and foremost," whose ownership purportedly grants voting rights on proposals to dictate the Mango Markets protocol's future.

57.     While the Litepaper explained that "[a]nybody with 0.1% of Mango Token" could propose a governance action, the Mango DAO's website set forth different amounts of MNGO tokens that were required to be deposited depending on the nature of the governance proposal.

58.     Thus, under the terms set by Mango, not all MNGO token holders were eligible to submit every type of governance proposal.

59.     Moreover, because governance "[p]roposals are executable code, not suggestions for a team or foundation to implement," according to Mango's Litepaper, not all MNGO token holders may have had the requisite technical skills to submit governance proposals.

60.     As governance proposals were also "subject to a 3 day voting period" and if a "majority and at least 2% of the Mango Token supply are cast for the proposal, it . . . can be implemented after 2 days," according to the Litepaper, only a small percentage MNGO token holders needed to vote for any proposal.

61.     In practice, only a small number of MNGO token holders actually exercised their potential voting rights.

62.     Immediately following the sale, the ownership distribution of MNGO tokens was at least 50% in the hands of Mango's creators because an equal amount of MNGO tokens were received by the creators of Mango Markets as were offered and sold to the general public.

63.     Therefore, despite thousands of wallet addresses holding MNGO tokens, on average, approximately five-to-ten addresses voted on any given proposal, and a few repeat wallet addresses, including wallet addresses controlled by several of the creators of Mango Markets, dominated the votes.

64.     In addition, shortly after the token sale, a governance proposal was made to establish a seven-member "mango v3 program upgrade council," which included the creators of Mango Markets (the "Upgrade Council"). The proposed Upgrade Council would have the authority to unilaterally (*i.e.*, without a governance proposal) control upgrades of the Mango Markets platform through a majority vote.

65.     The Upgrade Council proposal passed with 2.29% of the Mango token supply voting in favor. Of the supporting votes, at least 70% (1.64% of the 2.29%) were cast by two of the creators of Mango Markets.

66.     Based on the foregoing, MNGO token holders invested in a common enterprise with an expectation of profits derived from the efforts of others.

**Eisenberg Attacks Mango Markets and Manipulates the MNGO Token.**

67.     To use Mango Markets, an investor had to connect a crypto asset wallet to the Mango Markets trading platform, create a Mango Markets account, and deposit crypto assets into that account.

68.     After an investor had created and funded a Mango Markets account, the investor could trade different types of crypto assets, including the MNGO token, on Mango Markets.

69.     Investors could also buy and sell MNGO perpetual futures on Mango Markets based on the relationship between the value of MNGO and the value of USDC.

70.     Mango Markets also allowed investors to borrow crypto assets, in amounts based on the value of the borrower's Mango Markets portfolio, and to withdraw those borrowed crypto assets from Mango Markets.

71.     Prior to October 11, 2022, Eisenberg created two anonymous accounts on Mango Markets ("Mango Account-A" and "Mango Account-B") that he controlled.

72.     On October 11, 2022, while located in the United States, Eisenberg funded Mango Account-A and Mango Account-B each with approximately 5 million USDC.

73.     Eisenberg then directed Mango Account-B to sell to Mango Account-A MNGO perpetual futures based on the relative value of MNGO and USDC.

74.     The MNGO perpetual futures position was based on a total of 488,302,109 MNGO (out of approximately 500 million tokens in circulation), at a price of 0.0382 USDC/MNGO.

75.     Accordingly, Mango Account-A held a synthetic "long" position, the value of which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO, and Mango Account-B held a synthetic "short" position, the value of which would rise if the value of MNGO relative to USDC fell below 0.0382 USDC/MNGO.

76.     Later that same day, beginning at approximately 6:26 p.m. EDT, and continuing over an approximately 20-minute period, Eisenberg submitted MNGO token orders (some of which he cancelled) at incrementally higher prices on various crypto asset trading platforms. Eisenberg used USDC and another crypto asset called USDT to purchase large amounts of MNGO tokens through multiple transactions totaling over 4.5 million MNGO.

77.     For example, on one crypto asset trading platform, Eisenberg purchased 3.5 million MNGO tokens through approximately 10 transactions.

78.     On another crypto asset trading platform, Eisenberg purchased over 1 million MNGO tokens through the following six transactions:

| Sending Time (UTC) | Symbol | Side | Last Execution Time (UTC) | Order Price | Avg. Price | Order Qty | Filled Qty | Order Status |
|---|---|---|---|---|---|---|---|---|
| 2022-10-11 05:06:38 | MNGO/USDT | Buy | 2022-10-11 05:07:19 | 0.04 | 0 | 124,751 | - | Canceled |
| 2022-10-11 22:26:59 | MNGO/USDT | Buy | 2022-10-11 22:26:59 | 0.13571 | 0.04007 | 32,441 | 32,441 | Filled |
| 2022-10-11 22:27:04 | MNGO/USDT | Buy | 2022-10-11 22:27:04 | 0.13571 | 0.04096 | 30,201 | 30,201 | Filled |
| 2022-10-11 22:27:34 | MNGO/USDT | Buy | 2022-10-11 22:27:36 | 0.13571 | 0.11752 | 197,560 | 197,560 | Filled |
| 2022-10-11 22:27:48 | MNGO/USDT | Buy | 2022-10-11 22:47:14 | 0.45529 | 0.04962 | 840,255 | 769,837 | Partial Fill |
| 2022-10-11 22:28:06 | MNGO/USDT | Buy | 2022-10-11 22:28:06 | 0.45529 | 0.45529 | 25 | 25 | Filled |
| 2022-10-11 22:35:36 | MNGO/USDT | Buy | 2022-10-11 22:45:23 | 0.45529 | 0.45529 | 23,223 | 23,223 | Filled |
| 2022-10-11 22:35:53 | MNGO/USDT | Sell | 2022-10-12 02:53:46 | 0.49 | 0 | 257,516 | - | Canceled |
| 2022-10-11 22:47:14 | MNGO/USDT | Sell | 2022-10-12 02:53:46 | 0.05 | 0.05783 | 795,771 | 847 | Partial Fill |

| Total MNGO/USDT | BUY | SELL |
|---|---|---|
| Quantity Ordered | 1,248,456 | 1,053,287 |
| Quantity Cancelled | 195,169 | 1,052,440 |
| TOTAL FILLED | 1,053,287 | 847 |

79.     The trading volume on the day of Eisenberg's manipulation was over 2,000% higher than the average volume for MNGO the preceding ten days, and 2,018% higher than the average volume for the preceding 90 trading days. Eisenberg's trading accounted for as much as 90% of the trading volume on some exchanges on October 11, 2022.

80.     As a result of Eisenberg's transactions, the price of the MNGO token artificially increased from approximately 0.0382 USDC/MNGO to as high as approximately 0.91 USDC/MNGO on some crypto asset trading platforms.

81.     This price manipulation was possible in part because MNGO is a thinly traded token with low liquidity.

82.     The price of the MNGO perpetual futures position held by Mango Account-A depended on, among other things, the relative value of MNGO tokens and USDC.

83.     To determine the relative value of MNGO and USDC, Mango used an "oracle," which employed a computer program that calculated the relative value of crypto asset pairings by looking at the exchange rate of those crypto assets on three other crypto asset trading platforms (the "Oracle Price Source Platforms").

84.     The oracle information was automatically input to Mango Markets such that when the oracle price changed for a particular crypto asset pairing, the price of perpetual futures in that crypto asset pairing also changed on Mango Markets.

85.     Changes in the relative price of crypto asset pairs, such as MNGO and USDC, on the Oracle Price Source Platforms therefore impacted the price of perpetual futures on Mango Markets.

86.     Eisenberg focused his purchases of the MNGO tokens described in paragraph 76 on the Oracle Price Source Platforms.

87.     As a result of Eisenberg's manipulative trading of the MNGO token on Oracle Price Source Platforms and another crypto asset trading platform during this period, the price of MNGO perpetual futures on Mango Markets rose from approximately 0.0382 USDC/MNGO to a high of approximately 0.54 USDC/MNGO, causing the price of the long MNGO perpetual futures position held by Mango Account-A to increase, an increase of over 1,300%.

88.     Using the artificially inflated value of the long MNGO perpetual futures position in Mango Account-A as collateral, Eisenberg borrowed, then withdrew, approximately $116 million worth of various crypto assets from Mango Markets through 19 separate transactions.

89.     While Eisenberg purported to be borrowing crypto assets, he had no intention of repaying them.

90.     Eisenberg's withdrawal of approximately $116 million worth of various crypto assets left Mango Markets at a deficit because the total value of users' assets on Mango Markets at the time of Eisenberg's attack was approximately $104 million.

91.     Accordingly, when Eisenberg withdrew approximately $116 million worth of various crypto assets, he put Mango Markets at a deficit in a number of crypto assets.

92.     Mango Markets used, in part, the deposit and assets belonging to other Mango Markets investors to loan the crypto assets to Eisenberg.

93.     After Eisenberg stopped purchasing large amounts of the MNGO token to artificially inflate its price, the price of MNGO tokens then fell to 0.031 USDC/MNGO, with prices dropping as low as 0.0198, causing the price of MNGO perpetual futures on Mango Markets to decrease to approximately 0.02 USDC/MNGO.

94.     Eisenberg only began selling the MNGO tokens he acquired on October 11, 2022 after the price had declined to near pre-manipulation levels.

95.     From the peak of Eisenberg's manipulation of the MNGO token to the date of this filing, the price dropped by approximately 90% in regular market trading, the volume fell by approximately 80%, and, as described below, the MNGO token became even more illiquid.

**Mango Shuts Down Mango Markets.**

96.     On October 12, 2022, a majority of the Upgrade Council voted to halt version 3 of the Mango Markets platform, and one of the creators of Mango Markets developed, integrated, and deployed code to shut down the entire market. Mango Markets remains inoperative as of the date of this filing.

97.     MNGO token holders did not propose – or vote on – a governance proposal to halt the Mango Markets platform.

98.     Between October 11 and 13, 2022, certain members of the Upgrade Council –
again, without a proposed or approved governance proposal – negotiated on behalf of the
platform with an individual purporting to be the perpetrator over, among other things, the return
of a portion of the crypto assets obtained through the attack.

99.     After further negotiations, on October 13, 2022, certain members of the Upgrade
Council submitted a governance proposal on the Mango DAO message board. Specifically, the
governance proposal included, among other things, the following terms: (a) if the controller of a
specified wallet returned certain crypto assets to wallets controlled by the Upgrade Council and
Mango Markets developers within 12 hours of the proposal opening "as a show of good faith,"
and sent additional crypto assets "within 12 hours once the vote is complete and passes,"
(b) Mango Markets would use those funds (and funds in the Mango DAO treasury) "to cover the
remaining bad debts in the protocol" and make all Mango depositors whole, and (c) MNGO
token holders would waive any potential claims and would not pursue criminal investigations or
freezing of funds.

100.    The governance proposal passed with 9.46% of MNGO token holders voting in
favor and 0.33% of MNGO token holders voting against.

101.    Wallet addresses controlled by two members of the Upgrade Council – and who
were also involved in the negotiations with the perpetrator of the Mango Markets attack –
comprised more than half of the support for the proposal (5.17% of the 9.46% of MNGO token
holders voting in favor, or 53% of all token votes cast).

102.    While the vote was underway, a wallet controlled by Eisenberg sent
approximately 10 million USDC to a wallet controlled by members of the Mango DAO.

103.    After the proposal passed, multiple crypto asset wallets controlled by Eisenberg

sent approximately $57 million worth of crypto assets to the Mango DAO.

104.    The remaining approximately $49 million of the total $116 million worth of different crypto assets that Eisenberg borrowed, and then withdrew from Mango Markets, was never received by the Mango DAO or Mango Markets.

**Eisenberg Admits He Manipulated the MNGO Token.**

105.    On October 15, 2022, Eisenberg revealed his identity on Twitter, issuing a "statement on recent events":

> I was involved with a team that operated a highly profitable trading strategy last week. I believe all of our actions were legal open market actions, using the protocol as designed, even if the development team did not fully anticipate all the consequences of setting parameters the way they are. Unfortunately, the exchange this took place on, Mango Markets, became insolvent as a result, with the insurance fund being insufficient to cover all liquidations. This led to other users being unable to access their funds. To remedy the situation, I helped negotiate a settlement agreement with the insurance fund with the goal of making all users whole as soon as possible as well as recapitalizing the exchange . . . It is not illegal to be smarter than your counterparties in a swap transaction nor is it improper to understand a financial product better than the people who invented that product.

106.    By engaging in the market manipulation described above, Eisenberg knew, or was reckless in not knowing, he was engaged in manipulative, deceptive, and fraudulent conduct, because his purchase of MNGO tokens and market manipulation were intended to create the false appearance of robust trade volume in MNGO tokens and artificially prop up the token's price, in order to induce market participants to trade in MNGO tokens and drive up the price of MNGO tokens, thereby increasing the price of MNGO perpetual futures on Mango Markets and causing the price of Eisenberg's long MNGO perpetual futures position to increase.

**Mango Plans to Launch Mango Markets Version 4.**

107.    Version 3 of Mango Markets remains halted.

108.    However, Mango has been touting the upcoming launch of version 4 of Mango Markets on its website and on social media, stating, for example, that the "next generation of Mango is on the horizon. With exciting new features and risk mitigation strategies, Mango v4 is your one-stop DeFi shop."

109.    The creators of Mango Markets have been involved in developing the code for version 4.

110.    Mango has not announced the launch date.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c)

111.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 110, as though fully set forth therein.

112.    By reason of the conduct described above, Defendant, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by the use of the means and instruments of interstate commerce or of the mails, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

113.    In engaging in the conduct described herein, Defendant acted knowingly and with a reckless disregard for the truth.

114.    Eisenberg knew, or was reckless in not knowing, he was engaged in manipulative, deceptive, and fraudulent conduct, because, among other things, Eisenberg's purchases of MNGO tokens and market manipulation was intended to create the false appearance of robust trade volume in MNGO tokens and artificially prop up the token's price, in order to induce market participants to trade in MNGO tokens and drive up the price of MNGO tokens, thereby

increasing the price of MNGO perpetual futures on Mango Markets and causing the price of Eisenberg's long MNGO perpetual futures position to increase.

115.     By virtue of the foregoing, Defendant violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. § 240.10b-5(a), (c)] promulgated thereunder.

### SECOND CLAIM FOR RELIEF
### Violation of Exchange Act Section 9(a)(2)

116.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 110, as though fully set forth therein.

117.     By reason of the conduct described above, Defendant directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities, creating actual or apparent active trading in such securities and/or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, to engage in market manipulation that affected the volume and prices of such securities for the purpose of inducing the purchase or sale of such securities by others.

118.     Eisenberg acted with the intent to induce trading by others.

119.     By virtue of the foregoing, Defendant violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

### PRAYER FOR RELIEF

**WHEREFORE,** the SEC respectfully requests that the Court enter Final Judgment:

**I.**

Finding that Defendant violated the statutes and rules set forth in this Complaint as to each;

**II.**

Permanently restraining and enjoining Defendant, and all persons in active concert or participation with him, from violating, directly or indirectly, the statutes and rules set forth in this Complaint as to each;

**III.**

Order Defendant to disgorge all ill-gotten gains derived from his illegal conduct as set forth in this Complaint, including prejudgment interest thereon pursuant to Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)];

**IV.**

Order Defendant to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Prohibiting Defendant from (i) participating, directly or indirectly, in the purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction shall not prevent Eisenberg from participating in any employer sponsored retirement plan offered pursuant to his employment, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

**VI.**

Grant such other and further relief as the Court determines to be necessary and appropriate.

**VII.**

Retaining jurisdiction over this action to implement and carry out the terms of all orders

and decrees that may be entered.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands that

this case be tried to a jury.

Date:   January 20, 2023                    Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

*/s/ Alyssa A. Qualls*
Alyssa A. Qualls (AQ-4247)
Kristin Pauley (KP-7633)
Attorneys for Plaintiff
United States Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
QuallsA@sec.gov
PauleyK@sec.gov